## FETRIDGE *a.* MERCHANT.

*New-York Superior Court ; Special Term, January,* 1857.

### INJUNCTION.—TRADE-MARKS.—LEGAL TITLE.

Where it appears, in an action to restrain an infringement of plaintiff's trade-mark, that defendant has deliberately, and without any previous connection with the particular business, adopted the emblems and appellations employed by plaintiff, simply to break in upon the trade and profit of the latter, an injunction should be granted, notwithstanding that it may appear to the court that the trade-mark claimed by plaintiff was intended and calculated to deceive the public. The public, in such case, should be left to its own guardianship.

The distinction, in the law of trade-marks, between a proper name and a "fancy" name,—considered.

An injunction should not be granted at the commencement of a suit brought to enjoin the defendant from the use of plaintiff's trade-mark, unless the legal right of plaintiff and the violation of it by defendant are very clear.

Motion to dissolve a preliminary injunction.

This action grew out of the same state of facts which gave rise to the case of Fetridge *a.* Wells (*Ante,* 144). The two cases should be read together. The present case, like that preceding, came up on a motion by defendants to dissolve a preliminary injunction granted by Mr. Justice Hoffman.

*Hull & Stocker,* for the motion.

*Brown, Hall & Vanderpool,* and *E. W. Stoughton,* opposed.

*Fetridge a. Merchant.*

HOFFMAN, J.—The subject of the right to specific trade-marks, and the cases in which a court will interfere by injunction for their protection has, of late years, been much considered, and some general rules have been fixed with reasonable certainty. The extent and application of other principles, invariably invoked in these discussions, is less clearly determined.

1. I apprehend that the questions as to the nature of the deception upon the public which will prevent the court from giving its protection, falls within the latter class. It is constantly insisted, and the position is sanctioned by some judges, that when the article in question is innocuous, or in some degree useful, no absurd panegyric or extravagant price is a reason for denying the interference. In short, as counsel once said before me, if a man should compound tallow with some high scent and beautiful coloring matter, and term it "The Ointment of Immortality," he has a right to appropriate so much of public credulity as he can, to this designation.

On the other side, it is well settled that when the deception consists in palming upon the public articles of the party's own manufacture or composition, for those of another who has obtained celebrity or notoriety, the court will remain inactive. This was the character of the deception practised in Partridge *a.* Mench. That case is reported when before the Vice Chancellor and Chancellor, in 2 Sandford's Chancery Reports, 622. It is also reported in the Court of Appeals in Howard's Appeal Cases, 548. Gardiner, Justice, places his decision upon the ground that the plaintiff was selling matches of his own manufacture as those of " A. Golsh," which had acquired considerable reputation. The decisions in Pidding *a.* How (8 *Simons*, 475), and in Perry *a.* Truefitt (6 *Beav.*, 66), rest upon the same principle.*

I have always considered that upon this branch of the subject the conduct of the defendant has a material influence. Has he deliberately, without any previous connection with the particular business, but simply to break in upon the trade and profit by the notoriety obtained by another, adopted his emblems and appellations? If he has, then, in my view, the question should be judged of solely as between the immediate parties, and the public should be left to its own guardianship.

---

* Compare the case of Samuel *a.* Buger (*Ante*, 88).

Such has undoubtedly been the case here. The defendants have avowedly and designedly adopted and used this name and these symbols of the plaintiff, to interfere with his trade and participate in his gains.

This is enough to prevent me from placing my decision upon the ground of the plaintiff having deceived the public. I abstain from urging the reasons of my opinion in this particular, which the different views of other judges, and especially of Mr. Justice Duer in the case of Fetridge a. Wells, just decided, in struct me may be wholly wrong, because my conclusion in this case will turn upon another point.

2. Another proposition is, that a name or appellation may be appropriated as a trade-name; that this may be given to a compound, or article, every ingredient or portion of which is open to the use of every one, but the sale of which, under that appellation, is not lawful to any other person.

It would scarcely be going too far to say, that the further removed such an appellation is from actually representing the article in question, the more exclusive and decided becomes the right to it. "Medicated Mexican Balm" had nothing in its composition peculiar to the land of Montezuma (6 *Beav.*, 66); and "Chinese Linament" was in all its ingredients a stranger to the Celestial Empire (4 *McLean*, 516).

It appears to me that the term "Balm of Thousand Flowers" is of this character. The article is a liquid soap, or perfumed liquid soap. That name would be the name of the article, because it would indicate its nature. The ingredients are palm oil, potash, sugar or honey, alcohol, and some strong scent, or a compound of strong scents. The connection from the use of honey, if employed by the plaintiff, is remote and fanciful. The term is in my opinion extrinsic, and not indicative.

I am compelled, then, to differ in this particular from the learned judge in the case of Fetridge a. Rice, in Boston. He treats the phrase "as the proper name and appellation of the article." But Judge Giles, of Maryland, considers it as "a fancy name—not one representing the ingredients or composition of the preparation." He proceeds upon the ground of its not having been an original appropriation by the plaintiff.

3. Another rule is, that even if the term used may be used in common, yet it may be employed by one with such peculiar em-

blems, colors, and devices, as to give to him an exclusive right. Strictly, the right of appropriation in such instances results from the peculiar emblems.

The case of Knott *a.* Morgan (2 *Beav.*, 219), is a striking example of this rule, where the use of the words "Conveyance Company," or "London Conveyance Company," was open to all, but the devices on the coaches were so similar as to justify the court in interfering.

The case of Partridge *a.* Mench (2 *Sandf. Ch. R.*, 622), is an instance of a dissimilarity which induced the court to refuse interference.

Tried by this rule, the present case is a doubtful one. The test is stated in Crawshaw *a.* Thompson (4 *Mann. & Gr.*, 385):— "Is there such a similarity as would impose upon ordinary persons? If it is calculated to mislead, the intention to deceive would be manifest."

The resemblances are marked. The boxes in size, shape, edging of the cover, and color of the body, as well as of the label used, are almost identical. There is a slight difference in the height of the boxes. The labels on them are of the same golden color. The differences are undoubtedly plain when scrutinized. The emblem at the top is a little different. There is the name of "Merchant's," a star, and the letter X on the defendant's box. These are visible and likely to attract attention.

When the boxes are opened, the arrangement of the number of the bottles is so similar that no one would find a difference without a careful scrutiny. Some of the bottles appear to have had wrappers; and these wrappers are wholly different. Those of the plaintiff are covered with advertisements of his books, and those of the defendants are plain. The difference of the inner papers are marked. The form of the top is somewhat raised, but the name on the defendant's, the star, and the X, form very noticeable differences.

It is justly observed by Butler, who appears to be a candid witness, that the dealers in quantities could not be deceived, but a chance purchaser might perhaps be so.

I look upon the case in this aspect as so doubtful that it will in truth depend upon the decision of the next and very important question, viz.: whether the plaintiff has a right to the appropriation, by first use or otherwise, of the term or name in question.

If he has, the differences will not protect the defendant. If he has not, they will effectually do so. I proceed to examine that question.

4. The rule may be stated in the language of Chancellor Walworth (Partridge *a.* Mench, 2 *Sandf. Ch. R.*, 625). " The question in such cases is not whether the plaintiff is the original inventor or proprietor of the article made by him, and upon which he now puts his trade-mark; or whether the article made or sold by the defendant under the complainant's trade-mark is an article of the same quality or value. But the court proceeds upon the ground that the complainant has a valuable interest in the good-will of his trade or business. He has appropriated to himself a particular label, sign, or trade-mark, indicating that the article is manufactured or sold by him."

In other words, invention of the article to be sold is not an element of decision. But the first use or appropriation of the designation or name is the material question.

This brings me to a point of most difficulty in the case. Did the plaintiff first appropriate the term so as to give him a prior right? Dr. Fontaine was the first person who employed it in the United States. This was in 1846. He manufactured an article which he termed " Dr. Fontaine's Balm of Thousand Flowers," and he says that the same term was used for cosmetics in Europe, in their different languages.

A large number of witnesses depose to the following effect— I use the language of one of them, Bazin, a perfumer of fifteen years :—" That to his knowledge the terms ' Balm and Thousand Flowers,' and ' Balm of Thousand Flowers' have been in common use in this country and in foreign countries, in their respective languages, for more than ten years, as applied to numerous kinds of cosmetics and fancy soap."

Similar statements are made by other witnesses. One says, that it has been so constantly used and applied to cosmetics for twenty years, in this country and elsewhere, that he has come to consider it a descriptive name of a cosmetic.

These affidavits are met by counter-statements of numerous dealers, to the effect, that they have never met with or heard of a cosmetic under that name, except those in question in this case. They have had, more or less, opportunities to have acquired such knowledge; and it is urged, and with much force, that the de-

fendants have not proven one instance of its use, except what may be traced to Fontaine, to the plaintiff, or the defendant.

One new question might arise upon facts which the weight of affidavits seems to establish; whether if the term was first used in this country by Dr. Fontaine, in 1846, and was acquired from him by the plaintiff, its general use in other countries, in their several languages, would justify the employment by others. Fontaine states that he found it first in a French writer. It was commonly adopted elsewhere; it may be that any one would have the right to use it here, merely translating it.

My conclusion upon this leading point of the case is, that the title of the plaintiff to appropriate the term to himself is not made out; that considerable doubt exists respecting it; and hence, that it is precisely the case in which the rule of Lord Cottenham, in Spottiswood *a.* Clark, and of this court, in The Amoskeag Manufacturing Company *a.* Spear, should prevail.[*] (2 *Sandf.*, 604.)

The order will be to discharge the injunction order, upon the defendants entering into an undertaking in the penalty of $2,500 to keep an account of their sales, and render the same when required by the order of a competent court. The plaintiff will establish in this action his legal title, if he can, as well as any other ground of relief upon the trial. Such undertaking will only be considered as security for keeping the account and rendering it.

Order to be settled upon two days' notice.

---

[*] See also The Merrimack Manufacturing Company *a.* Garner (2 *Ante*, 318).